IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 17, 2019

## STATE OF TENNESSEE v. EDDIE MADDLE

**Appeal from the Criminal Court for Putnam County**
**No. 2016-CR-89     Gary McKenzie, Judge**

_____

### No. M2019-00673-CCA-R3-CD
_____

The Defendant, Eddie Maddle, was convicted by a Putnam County jury of possession with the intent to sell or deliver .5 grams or more of methamphetamine, a Class C felony, and was sentenced by the trial court as a Range II multiple offender to fifteen years in the Department of Correction.  The Defendant raises the following four issues on appeal: 1) whether the trial court erred by allowing evidence of crimes committed by the Defendant's wife; 2) whether the State established a reliable chain of custody for the drugs admitted into evidence at trial; 3) whether the Defendant was entitled to a mistrial on the grounds that a Tennessee Department of Correction ("TDOC") employee entered the courtroom and disrupted his trial; and 4) whether the evidence is sufficient to sustain the conviction. Following our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Seth B. Pinson (on appeal), and Edwin Sadler (at trial), Cookeville, Tennessee, for the appellant, Eddie Maddle.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Bryant Dunaway, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of a series of undercover methamphetamine purchases that a confidential informant working for the Putnam County Sheriff's Department ("PCSD") made from the Defendant's wife, Bobbie Sue Maddle ("Mrs. Maddle"). Two days after the last sale, drug task force agents executing a search warrant at the couple's home found and seized a number of incriminating items, including approximately 20 grams of methamphetamine, a set of digital scales, and pre-recorded cash that the confidential informant had paid to Mrs. Maddle in the undercover drug transactions. In a statement to law enforcement officers, the Defendant admitted that he and his wife sold methamphetamine to support their personal drug habits. He also provided the officers with details of their drug supply chain. The Putnam County Grand Jury subsequently returned a seven-count indictment that charged Mrs. Maddle with six counts of the sale of methamphetamine and the Defendant and Mrs. Maddle with the possession of more than .5 grams of methamphetamine with the intent to sell or deliver. Mrs. Maddle entered guilty pleas in her case prior to the Defendant's trial.

## Pretrial Hearings

### Mrs. Maddle's guilty pleas and statements implicating Defendant

The trial court addressed several issues in an April 11, 2017 hearing, including whether the State would be allowed to introduce evidence about Mrs. Maddle's guilty pleas and the statements she made to the informant about the Defendant's involvement in the sales. PCSD Detective Chuck Johnson testified that he was a member of the drug task force and the lead agent in the case, which involved the confidential informant's buying methamphetamine from Mrs. Maddle on six separate occasions in 2015: February 24, February 25, March 27, April 23, May 12, and May 19. The first and third transactions occurred inside the informant's vehicle in the parking lots of two stores, and the remaining four transactions occurred inside the Defendant and Mrs. Maddle's house trailer. The Defendant was present in the home on at least one occasion but did not directly participate in the sale.

Detective Johnson identified the text messages and transcripts of the phone calls exchanged between the informant and Mrs. Maddle, as well as the audio recordings and transcripts of the transactions. He agreed that Mrs. Maddle made several references to the Defendant's knowledge and involvement in the drug sales during her conversations with the informant. Specifically, during a conversation about providing more methamphetamine to the informant, Mrs. Maddle said that she would check to see what the Defendant had at the house; during a conversation about the couple's son having just been arrested with methamphetamine, Mrs. Maddle told the informant that the Defendant's response to learning of the arrest was, "Hell, he left with a gram"; and during a conversation in which the informant inquired about trading her vehicle for more methamphetamine, Mrs.

Maddle responded that she would have to check with the Defendant. Detective Johnson said that when the informant called Mrs. Maddle after the last sale to ask why the product looked different, Mrs. Maddle explained that it was still wet because she had just finished making it.

Detective Johnson testified that most of the methamphetamine uncovered during the search of the Defendant's home was located in the master bedroom of the trailer and consisted of approximately 20 grams in separate containers. In addition, they found a set of digital scales in the bedroom and two of the bills used in the undercover drug transactions. Officers found additional powder that tested positive for methamphetamine in a drawer of the coffee table in the living room and a liquid that tested positive for methamphetamine in the kitchen. They also found in the kitchen a number of items associated with the manufacture of methamphetamine, including bottles of drain cleaner, pseudoephedrine, lighter fluid, and cold packs. Detective Johnson testified that he advised the Defendant and Mrs. Maddle of their rights and they were questioned that day by PCSD Lieutenant Rebecca Wright and Special Agent Thomas Esslinger of the Drug Enforcement Administration ("DEA").

On cross-examination, Detective Johnson acknowledged that the informant became acquainted with Mrs. Maddle when the two women were incarcerated together. He said he was unaware of any contact the informant had with the Defendant, aside from the drug transactions. With respect to those drug transactions, he acknowledged that the Defendant was at home during only one sale, that the Defendant had two guests at the time and was not in the room where the sale took place, and that the Defendant did not participate in any of the recorded conversations with the informant.

Detective Johnson further acknowledged that he attempted to elicit the Defendant's cooperation as an undercover informant and that both the Defendant and Mrs. Maddle originally agreed to work with the drug task force. He said the Defendant participated in an undercover operation by paying a targeted individual for methamphetamine, but the individual returned the confidential funds to the Defendant without supplying any drugs. After that failed attempt at an undercover purchase, the Defendant refused any further cooperation. Detective Johnson acknowledged that the Defendant assisted Mrs. Maddle with at least one completed undercover drug transaction.

On redirect examination, Detective Johnson testified that the target of the Defendant's attempted undercover drug purchase told the Defendant as he returned the confidential funds that he had given up the business. Although he had no proof of any "behind-the-scenes communication" between the Defendant and the target, Detective Johnson had never before encountered a similar scenario and therefore found it "odd."

DEA Agent Thomas Esslinger, who participated in the May 21, 2015 interviews of the Defendant and Mrs. Maddle, testified that the Defendant expressed a willingness to cooperate with law enforcement and provided details of his and Mrs. Maddle's drug operation. Among other things, the Defendant named their supplier and told the agents that he and Mrs. Maddle bought approximately half an ounce of methamphetamine for $800 twice a week from that individual, which they in turn sold for $200 per "8-ball," or approximately 3.5 grams, in order to support their own personal use of methamphetamine. The Defendant also told the agents that Mrs. Maddle had manufactured some methamphetamine herself two days earlier.

Agent Esslinger testified that the Defendant was not promised anything in exchange for his cooperation but was informed that it would likely result in favorable consideration by the prosecutor and the judge with respect to his charges. On cross-examination, he acknowledged that he had no videotape or audio recording of the interview. He further acknowledged that the agents interviewed Mrs. Maddle first, but he denied having told the Defendant that without his help Mrs. Maddle would end up in the federal penitentiary.

At the conclusion of the hearing, the trial court found that the State had met its burden of showing that a conspiracy to sell drugs existed between the Defendant and Mrs. Maddle and that Mrs. Maddle's statement about needing to check with the Defendant to see if she could get more methamphetamine to sell was a statement made in furtherance of the conspiracy. The court, therefore, ruled that that statement was admissible at trial under the statement of a co-conspirator exception to the rule against hearsay. The court disallowed the other statements. The court reserved for a later date a ruling on whether evidence of Mrs. Maddle's guilty pleas would be admissible at trial. However, during opening statements at the Defendant's August 28-29, 2018 trial, defense counsel informed the jury that Mrs. Maddle had pled guilty to all seven counts of the indictment, including the six counts in which she was charged alone with the sale of methamphetamine.

## Chain of Custody

On August 27, 2018, the eve of trial, the trial court held a hearing on the State's motion for a ruling on whether the State had established a sufficient chain of custody for the drugs. The State sought the pretrial ruling because the Tennessee Bureau of Investigation ("TBI") scientist who had originally analyzed the drugs was on maternity leave at the time of the trial, which had led the State to have the drugs retested by a different TBI agent.

At the hearing, Detective Chuck Johnson testified that he was the officer in charge of gathering and maintaining the evidence seized from the Defendant's home on May 21, 2015. He said each item was placed in an envelope or paper bag, labeled with the date,

- 4 -

time, location, and identity of the individual who found it, and logged by himself into the evidence room. He separately identified the three pieces of evidence the State intended to introduce at the Defendant's trial: a container of methamphetamine found in the living room; a box of pseudoephedrine; and three red containers of methamphetamine that were found in the dresser drawer of the master bedroom. He testified that each item was labeled with the case number and his name.

Detective Johnson described in detail the procedure he employed in checking the items out of the evidence room, testifying that the evidence custodian located the evidence, printed out a form that he and the custodian each signed, and then transferred custody of the evidence to him. At that point, he had the evidence transported to the TBI laboratory for analysis, where a similar procedure was employed to check the items into the TBI laboratory.

TBI Special Agent Forensic Scientist Laura Cole, a chemist, testified that she analyzed the evidence at issue and issued a report on August 8, 2018, after having been asked to retest the items because the original agent was on maternity leave and unable to testify at trial. She described the process by which the laboratory received and tracked the evidence, testifying, among other things, that an "Evidence Submittal Form," with a unique identifying number, was submitted with the evidence when it was received by the TBI evidence technician and stored in the vault, and that details about the time, date, and persons involved in handling the evidence were logged into a TBI computer tracking system. According to Agent Cole, part of the evidence technician's duties included documenting whether the evidence was received in a "sealed condition"; moreover, if the evidence was not sealed, the technician would not accept it into the laboratory. Agent Cole further testified that if there was any abnormality in the packaging of evidence that she checked out of the vault for analysis, she would note it and contact her supervisor. She noted no abnormality in the evidence in this case. She identified a print out from the TBI's computer system that listed every individual who had possession of the evidence in the case.

Agent Cole testified that only Exhibits 1, 6, and 7 of the original materials that were submitted to the TBI laboratory for analysis were resubmitted for retesting. Of those three, only Exhibit 6, which consisted of methamphetamine in red cylindrical containers, came into the laboratory on not just two, but three separate occasions. According to her documentation, Exhibit 6 was first brought to the laboratory on June 23, 2015, by PCSD Detective Chris Miller; was picked up from the laboratory after testing on September 14, 2015, by PCSD Deputy Jenny Phillips; was brought back to the laboratory with a request that it be retested on April 13, 2017, by PCSD Detective Chuck Johnson; was picked up from the laboratory by Deputy Jenny Phillips after TBI management refused the request for retesting; was brought back to the laboratory on July 18, 2018, for retesting by PCSD

Detective Roger Cooper; and was picked up from the laboratory on August 23, 2018, by Detective Chuck Johnson after it had been retested.

Agent Cole identified the report she had prepared of her analysis of the evidence, as well as the earlier report prepared by her fellow TBI Special Agent Forensic Chemist Rebecca Hernandez. She said she was familiar with Agent Hernandez's earlier report, in which Agent Hernandez had noted that the substance in the red containers was a brown crystalline substance with a gross weight of 17.26 grams. Agent Cole testified that her findings were consistent with Agent Hernandez's findings regarding the total weight of the substances in the red cylindrical containers in Exhibit 6A because Agent Hernandez recorded the gross weight, which included the weight of the containers, whereas she removed the substances from the containers to weigh it separately.

On cross-examination, Agent Cole acknowledged that she had not observed Agent Hernandez's analysis of the drugs.

PCSD Deputy Stephanie Jean Philips testified that she was assigned to the evidence and property room, where her duties included receiving evidence for storage and transporting evidence to and from the TBI laboratory. She described the procedure employed to identify and track the evidence and stated that access to the room, to which she alone had a key, was strictly limited and controlled. She testified that she had retrieved items in the case from the TBI laboratory on two occasions. On neither occasion did she note anything amiss in the condition of the evidence.

PCSD Detective Chris Miller testified that he transported evidence in the case to the receiving clerk at the TBI laboratory on June 23, 2015. He saw nothing to lead him to believe that anyone had tampered with the evidence.

PCSD Detective Roger Cooper testified that he transported the evidence from the evidence room to the TBI laboratory on July 18, 2018, at the request of Deputy Philips, who was ill. He saw nothing amiss to cause him any concern about the possibility of tampering.

At the conclusion of the hearing, the trial court issued a preliminary ruling that the State had established a reliable chain of custody for admission of the drug evidence at trial, assuming that similar testimony was developed at trial.

## Trial

The State's first witness at trial was Detective Chuck Johnson, who reiterated much of the testimony he had provided at the April 11, 2017 hearing. In addition, he described

in detail the procedure whereby the confidential informant and her vehicle were searched before and after each transaction to ensure that she had no drugs or cash on her other than those exchanged during the undercover transactions, as well as the procedure used to collect, secure, and transport the drugs involved in the case to and from the TBI laboratory.

Detective Johnson testified that he was the agent in charge of five of the six undercover transactions involving the confidential informant: the first, second, third, fifth and sixth transactions. The case agent in charge of the fourth transaction was Lieutenant Rebecca Wright. The first transaction was supposed to be for the purchase of one-half gram of methamphetamine for $100, and the second, third, fifth, and sixth transactions were each supposed to be for the purchase of one gram of methamphetamine for $100. In each case, the actual amount of methamphetamine supplied by Mrs. Maddle was less than the amount that was bargained for, weighing, respectively, only .24, .47, .43, .51, and .42 grams. Detective Johnson testified that it was common for drug dealers to "short" a buyer in a drug deal in an attempt to increase the dealer's profit.

Detective Johnson also described in detail the execution of the search warrant at the Defendant's home, the discovery of the drugs and the items used in the manufacture of methamphetamine, and his collection of those items into evidence. He identified those items, including the following that were all found in a dresser drawer in the master bedroom: $462 in cash, including some that matched the prerecorded undercover bills; three red cylindrical containers of methamphetamine; and a set of digital scales. Finally, he explained to the jury how the various items found that were associated with the manufacture of methamphetamine were used in the manufacturing process, including the ammonium nitrate that was missing from one of the cold packs, which was found with the outer layer torn open.

On cross-examination, Detective Johnson acknowledged that not all the ingredients required for manufacturing methamphetamine were found during the search of the Defendant's home. He further acknowledged that the TBI laboratory had initially refused to retest the evidence that was resubmitted to the laboratory. On redirect examination, he testified that he knew of no reason for a cold pack to be torn apart other than to extract the materials inside to be used in the manufacture of methamphetamine. He agreed that the reason the State requested retesting of the methamphetamine in the red cylinders was that the original chemist had included the weight of the cylinders in her report.

DEA Agent Thomas Esslinger testified regarding his interview of the Defendant, the Defendant's statement about his involvement in the drug business, and the Defendant's initial willingness to work with the drug task force as it attempted to build a case against the Defendant's supplier. On cross-examination, he acknowledged that the drug task force sought the Defendant's and Mrs. Maddle's cooperation in their efforts to catch the larger

dealers in the supply chain of methamphetamine. He said he knew the Defendant cooperated to some extent, but he was unaware of the details.

On redirect examination, Agent Esslinger agreed that the Defendant revealed his extensive knowledge of the drug supply chain, telling the officers that Mrs. Maddle obtained the methamphetamine that she and the Defendant sold from a man named Gallops, who in turn received the drugs from a man named Henry who had connections with the Mexican drug cartel. On recross-examination, he testified that Mrs. Maddle provided similar information. He disagreed, however, that Mrs. Maddle was the major player in the enterprise.

PCSD Lieutenant Rebecca Wright testified that she was involved in the undercover drug operation and supervised the fourth undercover transaction on April 23, 2015. She described the procedure employed to ensure that the informant had no additional cash or drugs on her before or after the transaction, and she identified the drugs purchased in that transaction, which the TBI laboratory determined to consist of .60 grams of methamphetamine. She also described her participation in the interview of the Defendant and Mrs. Maddle and the Defendant's providing details about the supply chain involved in the drugs. According to her testimony, the Defendant made it very clear that both he and Mrs. Maddle were involved in the selling of methamphetamine.

On cross-examination, Lieutenant Wright acknowledged that the Defendant and Mrs. Maddle completed one undercover drug purchase for the task force.

TBI Special Agent Forensic Scientist Laura Cole testified at great length about her education and training as a forensic chemist and the identification, tracking, and safety and security measures employed by the TBI laboratory to ensure the integrity of evidence and the accuracy of test results. She also identified her laboratory report and the results of her testing of the three items she had analyzed. The first item was 1.8 grams of a powder that tested positive for methamphetamine and appeared to her to be a waste product of the manufacture of methamphetamine. The second item consisted of a brown crystalline substance, originally contained in three separate red containers, that tested positive for methamphetamine and had a total weight of 1.94 grams. The third item consisted of a package of tablets, one of which she analyzed and determined to be Pseudoephedrine, consistent with the labeling on the package. She additionally explained her fellow agent's maternity leave and how she became involved in the retesting of the evidence.

On cross-examination, she acknowledged that she had no knowledge of the Defendant's connection to any of the evidence, aside from the fact that his name was on the evidence and the evidence submittal form. On redirect examination, she testified that it was not unusual for an item to be retested if the analyst who originally tested it was

unavailable to testify at trial. As for the State's first unsuccessful attempt to have Exhibit 6 reanalyzed, her understanding was that the State requested retesting because Agent Hernandez provided only a gross weight, and that laboratory management refused the request because the additional weight of the substances in those containers was insufficient to meet the threshold weight to charge a higher felony. On recross-examination, she acknowledged that a TBI security officer in the past had stolen some drugs from the laboratory. She said that the episode occurred in the year 2000; since that time, the TBI had instituted polygraph testing for all employees.

The State was prepared to call as additional witnesses the Putnam County Sheriff's Department officers who had transported the evidence to and from the TBI laboratory, but defense counsel agreed to waive their testimony.

The Defendant elected not to testify or to call any witnesses in his defense. Following deliberations, the jury convicted him of the indicted offense.

## ANALYSIS

### I. Evidence of Drug Sales by Defendant's Wife

As his first issue, the Defendant contends that the trial court erred by allowing the State to introduce evidence of Mrs. Maddle's drug sales to the informant. The Defendant argues that the evidence should have been excluded under Tennessee Rule of Evidence 403 because any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading of the jury. Apparently acknowledging that he waived the issue by his failure to raise it at trial or in the motion for new trial, the essence of the Defendant's argument is that he was deprived of a fair trial due to the jury's having been "bombarded with evidence of criminal activity" of Mrs. Maddle, which served to confuse the jury and lead it to transfer Mrs. Maddle's guilt to the Defendant. The Defendant also asserts that he is entitled to plain error review. The State responds that the Defendant cannot show that a clear and unequivocal rule of law was breached, that the alleged error affected a substantial right of the Defendant's, that the Defendant did not waive the error for tactical reasons, or that consideration of the error is necessary to do substantial justice. We agree with the State.

In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five

factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

We note, first, that the Defendant did not specifically challenge the admission of the sales evidence in the pretrial hearing, at trial, or in the motion for new trial. On April 5, 2017, the State filed a notice of its intent to introduce evidence of Mrs. Maddle's drug sales. There is nothing in the record to show that the Defendant filed a motion in opposition. Instead, defense counsel focused at the pretrial hearing on the hearsay statements of Mrs. Maddle to the informant and the fact that Mrs. Maddle pled guilty to the offenses. Moreover, as previously mentioned, defense counsel himself focused at length on the drug sales and Mrs. Maddle's guilty pleas, both in opening statement and in closing argument, as part of his attempt to convince the jury that the drugs found in the home were solely the property of Mrs. Maddle and that the Defendant was not involved in the drug business. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## II. Chain of Custody

The Defendant next contends that the methamphetamine found in the Defendant's home should not have been admitted into evidence because the chain of custody of the evidence was insufficient. Specifically, he asserts that there was "a glaring hole" in the chain of custody due to the fact that the technician who originally tested the drugs was "suspiciously absent" from trial and only two of the several individuals who transported the drugs testified at trial concerning the chain of custody. The State argues that nothing in the trial proof undermined the reliable chain of custody that the State established at the pretrial hearing. We agree with the State.

Before a piece of tangible evidence can be introduced at trial, "a witness must be able to identify the evidence or establish an unbroken chain of custody" in order to ensure "that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Cannon, 254 S.W.3d 287, 296 (Tenn. 2008) (internal citations omitted); State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000). "An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item." Cannon, 254 S.W.3d at 296. "Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." Id. Whether or not the chain of custody has been sufficiently established lies within the discretion of the trial court and we review the trial court's determinations under an abuse of discretion standard. Id. at 295.

We find no abuse of discretion in the admission of the evidence. In the pretrial hearing, the State presented exhaustive chain of custody testimony from almost every individual who handled the evidence, with the exception of the TBI agent whose "suspicious absence" from the hearing and the trial was due to her maternity leave. Each of the witnesses who testified described in detail the procedures followed to ensure the integrity of the evidence, and each testified that there was nothing in the condition of the evidence that raised any hint of tampering. Several of those witnesses repeated their testimony at trial. Furthermore, the State stood ready at trial to call the additional chain of custody witnesses, with the exception of the TBI agent who was on maternity leave, but was assured by defense counsel that it was unnecessary because it was "going to be cumulative" and he "kn[e]w what their testimony [was] going to be." The Defendant cannot now complain about the fact that only two of those witnesses testified at trial when his own defense counsel agreed to waive the testimony of the additional witnesses. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

### III. Failure to Declare a Mistrial

The Defendant next contends that the trial court should have sua sponte declared a mistrial when a TDOC officer apparently entered the wrong courtroom and briefly interrupted the trial. During the direct examination testimony of TBI Agent Laura Cole, the following exchange occurred:

> THE COURT: Hold on just a second. Stop just a second. I'm sorry. What are we doing?
>
> UNIDENTIFIED MALE: TDOC
>
> THE COURT: Okay. TDOC. We're in the middle of a jury trial.
>
> UNIDENTIFIED MALE: Oh, I'm sorry.
>
> THE COURT: You're going to have to step out. That's okay. That's all right. I don't know, maybe you've got the wrong courtroom. Okay? They can help you, they can help you back there.
>
> UNIDENTIFIED MALE: Sorry, General. I don't mean to - -
>
> GEN. WILLIS: That's okay.

- 11 -

THE COURT: Just don't understand that's going on. I get uncomfortable when people start approaching. All right, go ahead. Reask your question. I apologize.

We agree with the State that the Defendant waived the issue by his failure to make a contemporaneous objection at trial and that he is not entitled to plain error relief on the basis of this issue. The Defendant appears to believe that the trial court should have sua sponte declared a mistrial, arguing that the interruption of the trial by the TDOC officer "suggested to the jury that the [Defendant] would be taken into custody, and that the jury's verdict was a foregone conclusion." We respectfully disagree.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527.

The interruption here comprised only a brief moment in a fairly lengthy trial, and there is nothing in the record to show that the jurors were upset by the interruption. There is also nothing to indicate that the jurors were even aware that "TDOC" stood for "Tennessee Department of Correction" or that they leapt from the accidental interruption of the trial by a TDOC employee to the conclusion that prison officials were waiting in the wings to transport the Defendant to the custody of the Department of Correction. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## IV. Sufficiency of the Evidence

Lastly, the Defendant contends that the evidence is insufficient to sustain his conviction, arguing that the evidence at trial showed only that Mrs. Maddle, and not the Defendant, was selling methamphetamine. The State cites the Defendant's statement to law enforcement admitting that he was involved in the sale of the drugs, Mrs. Maddle's statement to the informant about needing to check with the Defendant about any additional amount he had ready to sell, and the fact that the methamphetamine and some of the buy money from one of the undercover transactions were found in a drawer of the master

- 12 -

bedroom as evidence from which the jury could find that the Defendant possessed the drugs with the intent to sell or deliver them. We, once again, agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

"A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Viewed in the light most favorable to the State, we conclude that the evidence was sufficient for the jury to find the Defendant guilty of the possession of .5 grams or more of methamphetamine with the intent to sell or deliver. In addition to the methamphetamine, digital scales, and prerecorded bills found in the dresser drawer of the master bedroom, Mrs. Maddle told the confidential informant she would have to check with the Defendant for further product to sell and the Defendant himself provided a confession to law enforcement in which he admitted that he was involved with his wife in the sale of methamphetamine. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE